**Opinion filed February 16, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00043-CR

_____

## NORMAN EARL HORTON, JR., Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 35th District Court**
**Brown County, Texas**
**Trial Court Cause No. CR17205**

### M E M O R A N D U M   O P I N I O N

Norman Earl Horton, Jr., was indicted in three separate counts for aggravated sexual assault of a child by penetration of her sexual organ. The victim, T.C., was the stepdaughter of appellant. She was younger than fourteen years of age on all three occasions. For the aggravated sexual assault alleged in Count I of the indictment, the jury found appellant guilty and assessed punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for sixty years and a fine of $10,000. For the aggravated sexual assault alleged in Count III, the jury found appellant guilty and assessed punishment at confinement for life and a fine of $10,000. For Count II, the jury found appellant guilty of the lesser included offense of indecency with a child and assessed punishment at confinement for twenty years and a fine of $10,000. The trial court ordered that the "Count II sentence of 20 years TDCJ-ID runs

concurrent" and the "Count III sentence of Life runs consecutive to Count I sentence of 60 years TDCJ-ID."

Appellant presents five issues on appeal: the trial court erred in admitting evidence of an extraneous "bad act"; the evidence was factually insufficient to support the convictions for the aggravated sexual assaults; the evidence was factually insufficient to support the conviction for indecency with a child; the trial court abused its discretion in cumulating the sentence for the indecency conviction with the sentences for the two aggravated sexual assault convictions; and the trial court's sentencing violated the prohibitions in the United States Constitution and the Texas Constitution against a state applying an ex post facto law. We modify the judgment of the trial court to make it clear that the twenty-year sentence runs concurrent with the Count I sentence of sixty years. Otherwise, we affirm.

*Background Facts*

At the time of trial, T.C. was twenty years old and living in Louisiana. Appellant entered T.C.'s life when she was four or five. Her parents were in the middle of a bitter divorce. T.C., her mother, and her brother were living in a trailer behind a Mexican restaurant near Lake Brownwood. Her mother and appellant began a relationship, and appellant moved in with them. They subsequently married.

T.C. testified that she was about eight and one-half years old and in the fourth grade when appellant first sexually assaulted her. T.C. stated that the first sexual assault by appellant occurred when she had stayed home sick. Appellant was wearing a robe and asked her to sit beside him on the couch. He asked her to feel his penis, and she did. Appellant then took her to his bedroom and had her undress. T.C. testified, "[H]e put himself into me for a few minutes. I don't know how long." She told him that it hurt, and he stopped. He then told her, "Don't tell Mom." T.C. stated that she did not tell her mother because she did not think that her mother would believe her and because she was afraid of appellant.

During a sleepover when T.C. was in the fifth grade, she told one of her close friends about the sexual encounter with appellant. T.C. and that friend were subsequently with another close friend, having a deep discussion late at night, when T.C. also told that friend. T.C. insisted to both girls that they must not tell anyone because she did not want to tear her family apart. Neither girl ever told anyone, but both testified at trial about those discussions. At trial, the two friends were in their twenties, and one was married.

2

T.C. testified that appellant emotionally and mentally abused her and her brother. She described appellant as a "true Marine" who would harshly discipline them. For example, she remembered appellant requiring her brother to hold a rifle out in "dead zombie time" and requiring them to clean the bathroom with a toothbrush. T.C. also stated that they moved around Brownwood a lot when she was young; however, she remembered where they were living when the assaults occurred.

When T.C. was thirteen years old and in the seventh grade, the second sexual assault occurred. They were living in a rented house on Avenue E in Brownwood at the time. T.C. testified that she was staying home because she was sick. She remembered that it was in February or March because the weather was cold. T.C. said she was asleep when she heard something at the door. Appellant came in, lifted up her shirt, and started kissing her breasts. He then asked her to go into his bedroom, get undressed, and get on the bed. She did, and she remembered that he was wearing boxer shorts, which he took off. Appellant "put himself into [her] like the time before." When he finished, he told her to take a shower and clean herself "real good." While she was in the shower, appellant asked her if she was taking birth control pills. T.C. told him that she was. She explained to the jury that she was taking the pills because she was having problems with her menstrual cycle at the time and her doctor had prescribed them. During her testimony, she confirmed that her sexual organ had been penetrated by appellant's penis during both assaults.

The last incident occurred the following summer when she was still thirteen years old. She had just had her hair highlighted for the first time. Appellant had told her not to have her hair colored. When she came home, she showed him her hair. She stated, "And the next thing I remember, I was standing in his bedroom and he told me to feel [his penis]. And [she] did." However, he did not penetrate her that time. It was the last sexual contact she had with appellant.

T.C. testified that she did not tell anyone after the last two occasions. She remembered that it was in December in her ninth grade year when she learned that her uncle and his wife were going to move to San Diego. She planned to ask them to take her because she did not want to continue living with appellant and her mother. She told a few friends that she was going to ask her uncle, and they asked her why she wanted to leave. One of her friends asked her in class, and T.C. wrote a note telling her about the actions of appellant. Although T.C. asked the friends to not tell anyone, they took the note to Reca Godfrey, the school counselor, who called T.C. to

her office.  T.C. told Godfrey what had happened on the three occasions, and Godfrey called T.C.'s mother.  After her mother came to the school and visited with T.C. and Godfrey, her mother took T.C. home where they called a local police officer they knew, Troy Carroll, who came to their home to begin the police investigation.  Officer Carroll turned the investigation over to Detective Richard Williams of the Brownwood Police Department.  T.C. and her mother also contacted Child Protective Services.

Detective Williams's testimony essentially reiterated T.C.'s trial testimony.  He had asked T.C. if there had been any moisture or blood after the assaults.  He first testified that he remembered T.C. stating that she had not noticed any moisture or blood. However, after reviewing his notes during the trial, Detective Williams subsequently corrected his testimony and said that he had written "there was a little blood" in the margin of his report; he had not noted to which sexual assault his note related.  Detective Williams also testified that he had asked T.C.'s mother if she had noted any changes in T.C. about the time of the first sexual assault.  She responded that she had noticed changes in T.C.  Detective Williams discussed his interview with Dana O'Connor of Child Protective Services and T.C.'s written report to O'Connor that described the assaults.

A few weeks after meeting with Detective Williams, T.C. and her mother went to San Angelo where T.C. underwent a sexual assault exam.  The sexual assault nurse, Angela Wilke, testified that her examination of T.C. revealed a well-healed "notch" on T.C.'s hymen. The nurse testified that the trauma to T.C.'s hymen that she found was unusual because T.C.'s hymen had been permanently separated by a penetration that left a permanent cleft in T.C.'s hymen after it healed.  Wilke stated that trauma to the hymen was unusual even in assault cases. She further testified that the level of injury was consistent with an adult male sexual organ penetrating the female sexual organ of a child.

Witnesses for the State included T.C., T.C.'s mother, Godfrey, Officer Carroll, Detective Williams, Wilke, and T.C.'s two close friends from the fifth grade who have remained close friends even though they and T.C. live in different states.

In defense, appellant testified and called nine witnesses.  Appellant had delayed the cross-examination of T.C. until he put on his defense and called T.C. as a witness.  T.C. admitted that the family was in turmoil when her mother divorced her natural father and appellant first moved in with T.C.'s mother, T.C., and T.C.'s brother.  She admitted that those were difficult times because her natural father and appellant did not get along.  She admitted that her natural

father wanted custody of her and her brother, but she testified that he did not ask her to say anything that might help him in the custody fight.

Carolyn Peoples, appellant's mother, testified that appellant had never had an unusual sexual interest in children, that she had never known appellant to be cruel toward children, and that T.C. had not appeared to her to be afraid of appellant. She admitted that appellant had been raised by his father to be a strict disciplinarian. She also admitted that she was not around T.C. or the family very often. She saw them about once a year.

Shane Horton, appellant's brother, testified that he did not know T.C. very well and had not spent much time with T.C. He also said that he had never known appellant to have an unnatural sexual interest in children and that appellant always told the truth. He acknowledged that his brother believed in discipline. He had seen appellant make T.C. and her brother clean the bathroom with a toothbrush. Shane admitted that he was not around when any of the alleged assaults happened. He did testify that he saw T.C. exhibit friendly behavior with appellant at a carnival when appellant gave T.C. and her half sister money for rides. Shane thought that that was unusual in light of T.C.'s accusations.[1]

The remainder of the defense witnesses either had not known appellant until after T.C.'s outcry to Godfrey and the ensuing investigation or were not around appellant very often when he was married to T.C.'s mother. Jenny Strickland, a friend in Brownwood, and Arthur Rodriguez, a pastor in Crane, Texas, testified that they did not believe appellant had an unnatural sexual interest in children, that he was not cruel to children, and that his reputation for telling the truth was good. But they did not meet appellant until after T.C.'s allegations became public.

By the time of trial, appellant had remarried and lived in Crane. His wife, Suzanne Horton, and her two daughters testified on behalf of appellant. They said that appellant treated them well and that they were never uncomfortable around him. They also testified that they had not observed appellant to have an unnatural sexual interest in children and that he had a good relationship with his other daughter who was T.C.'s half sister, a child of appellant and T.C.'s mother.

James Cleveland, a longtime friend of appellant, testified that appellant did not have an unnatural interest in children and that appellant had never lied to him. He admitted that he had

---

[1]T.C.'s mother had provided an explanation during the State's case. She testified that T.C. was in counseling at the Child Protective Center for a year. T.C. had avoided seeing appellant when he came to pick up her half sister, but finally she told her mother that she had to face appellant stating, "Mom, I'm going to have to face my demons one day, and it might as well be today." After that, T.C. did not hide from appellant.

only seen appellant three or four times a year during the ten years that appellant was married to T.C.'s mother. Cleveland thought that T.C.'s mother was appellant's first wife; she was appellant's second wife.

Appellant testified that none of the alleged sexual assaults had occurred. He admitted that he and T.C. did not agree on a lot of subjects. According to him, T.C. would wear "the skimpiest shorts [he] had ever seen." He claimed he was never alone with T.C. because he was always on the road as a truck driver. He testified that, every time T.C. became sick, she would stay with her grandmother. He also testified that, while on one road trip, he had called T.C.'s mother and that he had called for four hours before finally talking with her. According to appellant, her explanation was that she had gone to the store. He was certain that she was cheating on him. He strongly claimed that he was always faithful to T.C.'s mother and never wanted to cheat on her. He expressly denied ever being in a game room in Comanche and said he did not know a woman named Cathy Hale.

In rebuttal, the State put into question appellant's claim and that of his witnesses that he was always truthful. The State pointed out that appellant had proposed to Suzanne in February 2006. Suzanne testified that he told her that he was divorced; that was not true. He was divorced in June 2006. T.C.'s grandmother, who worked for the Early school district for thirty-five years, testified that appellant was the one alone with the children when they were sick. She also testified that T.C. and her brother, when visiting, would ask to stay because they did not want to go home to stay with appellant. She further testified that, at times, appellant did not have a job and that he would be home with T.C. or her brother. She asserted that T.C. was very truthful and that this entire experience had been very hard for T.C. According to the grandmother, T.C. at first was comfortable around appellant, but when she was around nine, she began to express a desire to not be around appellant.

The jury no doubt remembered T.C.'s mother's testimony during the State's case. She testified that she had seen appellant emotionally and mentally abuse T.C. and enforce unusual punishments. Her parents had seen the abuse. She admitted that neither she nor her parents had done anything about the emotional and mental abuse. She also testified that, when T.C. was sick and appellant was not working, he would stay with T.C.

The State next called Cathy Hale as a witness to refute appellant's claims of truthfulness and fidelity. Hale worked at the courthouse and recognized appellant during the trial. She testified that, in 1998 and 1999, she was going through a divorce, was vulnerable, and spent time

6

playing games in the game room in Comanche. According to her, appellant would stand by her machine and flirt and finally began propositioning her. She turned him down, but later saw him and his brother while working at Mid-Tex Cellular. By that time, Hale had remarried.

After closing arguments, the jury deliberated for slightly over four hours and then returned its verdict.

*Sufficiency of the Evidence*

In appellant's second and third issues, he argues that the evidence was factually insufficient to support his convictions for the two aggravated sexual assaults and for the offense of indecency with a child. Appellant's brief was written before the Court of Criminal Appeals issued its opinion in *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). It is now clear that we review a sufficiency of the evidence issue, regardless of whether it is denominated as a legal or a factual sufficiency claim, under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks*, 323 S.W.3d at 912; *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Under the *Jackson* standard, all evidence, including circumstantial evidence, is considered. *Nguyen v. State*, 54 S.W.3d 49, 52 (Tex. App.—Texarkana 2001, pet. ref'd). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

T.C.'s testimony describing the three sexual assaults was supported by her outcry statements to Godfrey, the testimony of the SANE nurse who confirmed the outcry statements and explained the results of the sexual assault examination (the damage to T.C.'s hymen), T.C.'s written report to Child Protective Services (as related by Detective Williams), the testimony of her mother, and the testimony of her two friends that she told in the fifth grade about the first sexual assault when T.C. was eight and one-half years old.

Godfrey was T.C.'s counselor from the time T.C. was in the third grade until she graduated from high school. Godfrey testified that she had a master's degree in counseling and was a licensed professional counselor. When Godfrey called T.C. into her office about the note,

she asked T.C. if her statements in the note were true. T.C. told her that they were. T.C. testified that she began crying and shaking because she had finally told an adult. She had not wanted any adult to know because she did not want her mother to go through another divorce. Godfrey described T.C.'s initial outcry:

> I said, "[T.C.], I understand you have something you need to tell me." And when I told her – I mean, when I said that to her, she immediately just broke down, started crying, and told me that, yes, that she had been raped by her step-dad.
>
> And she began to tell me some of the details about how many times it happened and she told me that [the] reason he said that he wanted to do this to her was because she would be having sex some day and he wanted her to know what it felt like, he wanted to be the one to teach her how to do that.
>
> I talked to her about running away, why was she going to run away, what she needed to do. She said, "He told me that he was going to come back when I was 16 and do it again" and she was real scared for that reason.

Godfrey described T.C. as crying uncontrollably and shaking. T.C. was holding her head down, but Godfrey finally got T.C. to look at her and describe what had happened, which was that she had been penetrated twice. T.C. told Godfrey that she had told two close friends in middle school about the first time appellant had assaulted her. T.C. did not want to tell her mother, but agreed that she had to. T.C. was afraid about what would happen to her family, especially her mother and grandmother. T.C. thought that they might think less of her. Godfrey then called T.C.'s mother to come to the school.

The State introduced T.C.'s attendance records through Godfrey. For the year when T.C. turned thirteen, the records reflected that she was absent on February 5. The records also reflected that T.C. was absent only four times that school year. Godfrey agreed that any day T.C. missed would be memorable to T.C. because she missed so few days. For the following year, T.C. was absent only three days.

T.C.'s mother testified that, after T.C. and Godfrey told her about the assaults, she took T.C. out of school and contacted an officer they knew, Officer Carroll, with the Brownwood Police Department. She testified that she and T.C. packed everything up and moved out the next day. Two days after T.C. graduated from high school, she and the children (T.C., T.C.'s brother, and their half sister) moved to Louisiana. Although not detailed here, her testimony also added credence to T.C.'s testimony.

8

M.B.H. and A.M. were the friends in the fifth grade that T.C. told about appellant's sexual assault when she was in the fourth grade. They related T.C.'s description of the encounter. Both would tell T.C. that they needed to tell someone, but T.C. adamantly refused to allow anyone else to know. A.M. said that T.C. was concerned that it might tear the family apart.

After examining all of the evidence in the light most favorable to the verdicts, we find that a rational trier of fact could have found the essential elements of the three offenses beyond a reasonable doubt. Appellants second and third issues are overruled.

*Appellant's First Issue*

In appellant's first issue, he argues that the trial court erred in admitting evidence of the "bad act" of appellant propositioning Hale while he was married to T.C.'s mother. Appellant reasons that the act was irrelevant for any purpose except to show his propensity to commit other bad acts. We disagree. The evidence was admitted solely for impeachment and to rebut appellant's evidence that he always told the truth.

Appellant's witnesses had emphasized in their testimony that appellant always told the truth. Appellant's defense was that T.C. had made everything up and she was lying. During appellant's direct testimony, he was asked if there was an event that was making T.C. unhappy enough to want to go to San Diego. Appellant testified that he and T.C.'s mother argued because she was cheating on him. He related one specific instance where he had called T.C.'s mother for four hours while he and his lead driver were on a job. When he finally spoke to her, she said that she had been at the store. He then testified as follows:

> A. . . . Well, that went on several times. And that is what made me think that she was cheating on me. And come to find out later, she was.
>
> Q. All right. And were you being unfaithful to her, too?
>
> A. No, sir, I didn't even have a chance to.
>
> Q. All right.
>
> A. Or even wanted to.

Appellant stated that he and T.C.'s mother would argue about her infidelity and that T.C. was accurate when she said she would lie awake at night and listen to them arguing. Appellant also stated that, when he arrived home on December 3 or 4, he found that everyone had moved.

9

Several times during cross-examination, appellant again strongly denied that he had ever cheated on T.C.'s mother and that he had not even wanted to cheat. Appellant emphasized that he did not have time to ever cheat on his wife because of his heavy work schedule. He claimed that he had not gone to bars and other places to "hit on women" while married to T.C.'s mother. He testified that he did not know a woman named Cathy Hale.

Hale worked at the Brownwood courthouse and recognized appellant during the trial. Appellant objected to the State calling Hale as a witness because she had not been on the State's witness list and because the State had not given any notice of bad acts. In response, the State argued that Hale was only called as a rebuttal witness because appellant had called eight witnesses to talk about the truthfulness of appellant and because appellant's counsel had elicited appellant's testimony that T.C.'s mother was cheating on him and he had never even wanted to cheat. Appellant had put on a substantial amount of character evidence, and the State wanted to rebut that image.

The trial court held a hearing outside the presence of the jury where the State made a proffer of Hale's testimony. The State pointed out that appellant's theory in defense was that the mother was cheating on him and T.C. had created the entire story to somehow help her mother. Appellant's counsel argued that the marriage was falling apart in December 2003 and that that was "some 17 to 22 months after the last possible event had occurred. And [the failing marriage had] to do with the state of mind of this child when the outcry was made." Counsel then argued that any interaction between appellant and Hale was too remote in time and confused the issue. The State, in response, stated again that the testimony would simply be impeachment and that appellant had put his character in issue. The State further stated that it had just learned of this potential witness the previous day.

If a trial court determines that evidence of extraneous crimes or bad acts has relevance aside from character conformity and if a proper Rule 403 objection is made, the trial court must make a balancing determination under Rule 403. TEX. R. EVID. 403; *Montgomery v. State*, 810 S.W.2d 372, 388–89 (Tex. Crim. App. 1991). The trial court below expressly found that the probative value of the proposed testimony outweighed its prejudicial nature and that it would not confuse the issues. *See* Rule 403. The court instructed the State to limit its questions for impeachment purposes. After ruling that the witness would be allowed to testify "in a limited nature," the trial court asked appellant if he wanted any limiting instructions to make it clear that the testimony was for impeachment purposes only. Appellant declined the court's offer.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Oprean v. State*, 201 S.W.3d 724, 726 (Tex. Crim. App. 2006); *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim. App. 2001). An appellate court will not reverse a trial court's ruling unless that ruling falls outside the zone of reasonable disagreement. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Burden*, 55 S.W.3d at 615. We find that the trial court's ruling in this case did not fall outside the zone of reasonable disagreement. Rule 404(a) provides that evidence of a person's character or character trait, although generally not admissible, may be admitted if it is offered by the accused or by the prosecution to rebut the evidence offered by an accused. TEX. R. EVID. 404(a).

From the record, it appears that the defense strategy was to convey an image to the jury that appellant was hardworking and truthful, that his wife was unfaithful but he was not, and that T.C. had made up the outcry to help her mother. The State was entitled to call Hale as a witness in rebuttal. Appellant's first issue is overruled.

*Appellant's Fourth and Fifth Issues*

In appellant's fourth issue, he contends that the trial court abused its discretion in cumulating appellant's sentence for the indecency-with-a-child conviction with his sentences for the two aggravated sexual assault convictions. In his fifth issue, he argues that his sentencing violated the United States and Texas Constitutions prohibitions against a state applying an ex post facto law.

Appellant was convicted of three offenses: (1) Count I: an aggravated sexual assault on or about January 1, 2003; (2) Count II: indecency with a child by sexual contact on or about July 20, 1997; and (3) Count III: an aggravated sexual assault on or about July 20, 1998.

Appellant's argument is based on TEX. PENAL CODE ANN. § 3.03(a) (West Supp. 2011), which limits a trial court's discretion to cumulate sentences where a defendant has been found guilty of more than one offense arising out of the same criminal episode in a single trial. A criminal episode is defined as including the repeated commission of the same or similar offenses. Section 3.01 (West 2011). Appellant notes that the legislature in May 1997 amended Section 3.03(a) to add certain sexual offenses committed against a victim younger than seventeen to the list of those offenses subject to consecutive sentencing. *See* Section 3.03(b)(2)(A) (West Supp. 2011). The amendment permitted sentences for indecency with a child and aggravated sexual assault obtained in a single trial to be consecutive if committed on or after September 1, 1997.

In this case, the act of indecency with a child occurred prior to the effective date of the 1997 amendment to Section 3.03. The two aggravated sexual assault convictions were committed after the effective date. Appellant contends that the trial court's judgment erroneously orders the indecency-with-a-child sentence to run concurrent with both sentences for aggravated sexual assault despite the court having ordered the life sentence (Count III) to run consecutive to the sixty-year sentence (Count I).

Appellant's argument in his fifth issue is that the trial court's judgment amounted to an ex post facto law because the effect of the order is to have appellant's second sentence run twice, i.e., concurrent with the sentence in Count I and concurrent with the sentence in Count III that begins after the completion of the sentence in Count I.

The trial court's judgment provided the following special orders:

Count II sentence of 20 years TDCJ-ID runs concurrent.

Count III sentence of Life runs consecutive to Count I sentence of 60 years TDCJ-ID.

In response to both issues, we modify the trial court's judgment to make it clear that the twenty-year sentence runs concurrent with the Count I sentence of sixty years.

*This Court's Ruling*

The judgment of the trial court is modified to read "Count II sentence of 20 years TDCJ-ID runs concurrent with the Count I sentence of 60 years TDCJ-ID." Otherwise, the judgment of the trial court is affirmed.

TERRY McCALL
JUSTICE

February 16, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.